Meenoo Chahbazi (No. 029568)
Edmundo P. Robaina (No. 018125)
ROBAINA & KRESIN PLLC
5343 North 16th Street, Suite 200
Phoenix, Arizona 85016
Telephone: (602) 682-6450
Facsimile: (602) 682-6455
mch@robainalaw.com
epr@robainalaw.com

Attorneys for Plaintiff John McIver

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| John McIver, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>Honeywell International Inc.,<br><br>Defendant. | No.<br><br>**COMPLAINT**<br><br>**(ADEA)**<br><br>**(Jury Trial Demanded)** |

Plaintiff, John McIver, by and through his counsel undersigned, alleges as follows: This action is brought pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq*. (ADEA).

**PARTIES**

1. Plaintiff John McIver is a citizen of the United States, and a resident of Mesa, Arizona, who was previously employed by Defendant Honeywell International Inc. ("Honeywell") in its Aerospace division.

2. Honeywell is a Fortune 500 company that produces a variety of commercial and consumer products, engineering services and aerospace systems for a wide variety of customers, from private consumers to major corporations and governments.

3. Honeywell has more than 129,000 employees worldwide.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331,

1343; 42 U.S.C. § 2000e-5(f)(3); and 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-5(f)(3)).

5. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Arizona.

**GENERAL ALLEGATIONS**

6. Mr. McIver began his employment with Honeywell in approximately 1982 as an Associate Engineer. He last held the position of Senior Technician.

7. Mr. McIver was a dedicated and hard-working employee.

8. Mr. McIver received a pay increase and a promotion to Technician IV in the first half of 2014 based on his high level of skills and strong performance.

9. Mr. McIver also demonstrated very strong safety awareness and promptly and effectively addressed matters related to safety.

10. For approximately 12 years, Mr. McIver was designated as the point person on safety in the Material Engineering Department.

11. For approximately two and half years from around 2012 until approximately Fall 2014, Mr. McIver had spent approximately 1-3 days per week and 5 full weeks in Summer 2014 at the Tempe Materials Lab, becoming proficient in the SM-3 missile project and on the DAT wheel development when it picked up, at the request of the Advanced Technology customers.

12. Mr. McIver cross-trained and became certified with respect to the missile valve.

13. The SM-3 missile project was (and still is) considered one of the most important project in the Tempe Fluids Division of Honeywell.

14. Mr. McIver openly discussed his strong interest in working on the SM-3 missile project and the DAT wheel, and the customers wanted, requested and needed his assistance with both these projects at the Tempe Lab.

15. In approximately late August 2014, Ben Peterson became the Manager of the Process Development Lab and began to supervise Mr. McIver.

16. In approximately the last week of August 2014, Mr. Peterson and another Engineer made a surprise visit to the control room of the lab where Mr. McIver was working alone.

17. Mr. Peterson announced to Mr. McIver, "I'm your new Boss! Now you can start planning your retirement." This was the first time Mr. McIver learned Mr. Peterson would be his manager.

18. On or about the same day in approximately the last week of August 2014, Mr. Peterson stated to Mr. McIver's co-worker, Russ Bartos, and others that he had told Mr. McIver "I'm your new boss, now you can start planning your retirement."

19. In approximately September 2014, Mr. Peterson told Mr. McIver that his Process Development Lab (PDL) co-worker, Jim Cobb, who is younger than Mr. McIver, is the new work coordinator for the PDL and that all projects and customer contacts are now to be handled and routed through Cobb, who will then distribute the work.

20. In the past 32 years of Mr. McIver's employment, long-time PDL customers came directly to Mr. McIver with their work.

21. Mr. McIver was told that he could accept new work projects directly from the customers only if Mr. Cobb was not available.

22. After Mr. Peterson became Mr. McIver's supervisor, he scaled back Mr. McIver's duties and hours at the Tempe facility and Mr. McIver was no longer allowed to come to the Tempe Lab on a weekly basis to stay current on his certification with respect to missile valves and the SM-3 missile project.

23. Mr. Peterson also hindered Mr. McIver's work on the dual alloy wheel project, which was also known to be an important project, by limiting the time Mr. McIver could spend at the Tempe Lab.

24. Mr. Peterson questioned why Mr. McIver was involved in the DAT wheel project.

25. After Mr. McIver's Tempe hours were cut back, the DAT wheel customers and the SM-3 customers continued to request Mr. McIver's assistance.

26. Mr. Peterson prevented Mr. McIver from working on the SM-3 missile project and limited Mr. McIver's ability to work on the DAT wheel project, despite the fact that the customers were dissatisfied with his decision.

27. In approximately November 2014, Mr. Peterson yelled at Mr. McIver and told him, "If you don't like it here, why don't you just retire."

28. In the Fall of 2014, based on a customer request to clean the rig room hoods and vents, Mr. McIver planned to clean them the way they were designed to be cleaned by removing them and cleaning them outside.

29. Mr. Peterson insisted that Mr. McIver clean them in place, by hand.

30. Cleaning in place, by hand was unsafe, far more difficult, and counterproductive because it risked potential damage to the equipment.

31. Mr. Peterson claimed he would help Mr. McIver but he failed to do so.

32. Mr. McIver was required to climb onto the work table (which is about 40 inches tall, higher than a kitchen table) in order to lie or kneel there and reach up into the duct and under the hood to hand clean the equipment.

33. Mr. McIver was subjected to safety risks because he felt obligated to follow Supervisor Peterson's orders.

34. Mr. Peterson made untrue demeaning comments regarding Mr. McIver's performance, berated Mr. McIver, and incorrectly blamed him for things he did not do.

35. Mr. Peterson treated younger employees more favorably than older employees in additional ways by taking more of an interest in younger employees, grooming younger employees for employment opportunities, and using a disrespectful tone when speaking with older employees.

36. In late December 2014, Russ Bartos filled out a Honeywell Performance and Development (HPD) evaluation of Mr. Peterson, at the request of Richard Gadberry, Manager of the Materials Engineering Lab.

37. The HPD system is a type of intranet system where performance reviews are stored.

4

38. In his December 2014 HPD evaluation of Peterson, Mr. Bartos specifically stated that age discrimination was occurring in Mr. Peterson's group.

39. Mr. Gadberry later called Mr. Bartos and Mr. Bartos provided additional information regarding Mr. Peterson's age discrimination.

40. Mr. Bartos stated to Mr. Gadberry that the age discrimination needed to be addressed and stopped.

41. Mr. Bartos requested that Gadberry hold a "skip level meeting" with their group to discuss Mr. Peterson's age discrimination against older employees outside of Mr. Peterson's presence.

42. However, Mr. Gadberry did not ever set up a meeting with Mr. Bartos or the team to address concerns about age discrimination stated by Mr. Bartos in the December 2014 HPD.

43. Upon information and belief, Mr. Gadberry failed to make HR aware of either Mr. Bartos's verbal comments about Mr. Peterson's age discrimination or Mr. Bartos's HPD evaluation of Peterson, with its written statements concerning age discrimination.

44. Honeywell failed to take effective action to stop Mr. Peterson's age discrimination.

45. In approximately January 2015, Mr. Peterson promoted Jim Cobb, a PDL co-worker, who is younger than Mr. McIver to be a Work Flow Specialist.

46. Mr. Peterson continued to make discriminatory comments based on age and he continued to discriminate against older employees.

47. Mr. Peterson regularly and frequently made unjustified derogatory comments about Mr. McIver's performance and told Mr. McIver that he should retire.

48. For example, in approximately December 2014, Mr. Peterson again stated to Mr. McIver, "Well if you don't like it here, why don't you retire?"

49. In approximately early January 2015 during a discussion in which Mr. McIver told Mr. Peterson that he deeply enjoyed working on the DAT wheel and the SM-

3 missile project and he wanted to return to his normal hours of working more on those projects, Mr. Peterson responded that if you (Mr. McIver) are not happy, "you can always retire."

50. On or about January 9, 2015, Mr. Peterson stated to Mr. Bartos, "Jack [Mr. McIver] must have enough money. Why doesn't he retire? I don't want him here, I don't want him training Mike's replacement." He later said, "don't tell anyone I said that."

51. For the first time in his life, Mr. McIver filed an HR Complaint regarding discrimination in January 2015.

52. Jack McIver reported age discrimination by Mr. Peterson to Kimberley Branch of Honeywell's Human Resources on or about January 9, 2015.

53. On or about January 12, 2015, Mr. McIver met with Mr. Gadberry and again reported that Mr. Peterson subjected him to age discrimination and age-based harassment.

54. Mr. McIver requested that Mr. Gadberry transfer him to work under a different supervisor so that he would not be subjected to continued age discrimination and harassment by Mr. Peterson.

55. Mr. Gadberry allowed Mr. McIver to temporarily work at the Tempe lab until issues were investigated.

56. Mr. Gadberry told Mr. McIver, "The next time you have any contact with Peterson will be in the presence of an HR rep and me."

57. On approximately January 12, 2015, Mr. McIver filed a complaint of age discrimination and harassment on the Honeywell Ethics Hotline.

58. During the Honeywell investigation, which was handled by Kimberley Branch, Honeywell's HR Representative for the Materials Engineering Department, Ms. Branch defended Ben Peterson and showed a bias in Mr. Peterson's favor, despite the fact that witnesses corroborated that Mr. Peterson had made age-based, discriminatory comments.

59. On or about January 19, 2015, while Mr. McIver was working with his

head under the fume hood and cleaning SM-3 missile parts, he sensed that there was something behind him or near him. He straightened up and turned around and was startled to see Mr. Peterson standing there.

60. Mr. Peterson said, "I'm here to talk about your ethics complaint."

61. Mr. McIver was taken aback because Mr. Gadberry had told him that the next time he (Mr. McIver) would see Mr. Peterson was in the presence of HR and Mr. Gadberry.

62. On or about approximately late January 2015, Mr. Gadberry sent Mr. McIver an encrypted email that was also addressed to HR Representative Branch, and Ben Peterson.

63. Mr. McIver could not open the email and called Mr. Gadberry.

64. Mr. Gadberry told Mr. McIver that he wanted to see Mr. McIver in Phoenix right away.

65. Mr. McIver drove to Phoenix and Mr. Gadberry called Mr. McIver into a meeting with Mr. Peterson. Mr. Gadberry stated, "We're placing you on a PIP."

66. This was the first Performance Improvement Plan (PIP) that Mr. McIver had ever received in his approximately 33 years working for Honeywell.

67. The PIP from Mr. Peterson, dated January 28, 2015, contains a number of false statements, including but not limited to those stated herein.

68. For example, the PIP states that Mr. McIver does not consistently review electronic test data to confirm the test data ran correctly. However, it was not Mr. McIver's job responsibility to review electronic test data to confirm the test ran correctly.

69. The PIP also states that "in December, the mix ratio for CMAS rig was incorrect." The PIP falsely states that based on the formula of a 5 to 1 ratio, "2 liters of concentrate should have yielded 5 gallons of solution."

70. The PIP states that "Burner rig procedures are not being followed as specified." However, Mr. McIver was a diligent observer of safety protocols.

71. The PIP states that Mr. McIver requires "manager intervention for

motivation to perform day to day tasks;" however, Mr. McIver was a hardworking, self-motivated, and dedicated employee.

72. The PIP states that while "assisting with the DAT wheel program, Jack failed to let others know that he would be missing the scheduled Tier meeting."

73. However, it was well-known by Mr. Peterson that Mr. McIver would be assisting with the DAT wheel program on the date and time at issue.

74. Additionally, Mr. Peterson required Mr. McIver to give Mr. Peterson access to his calendar.

75. The PIP also states that Mr. McIver was verbally abusive to an employee; however, this was not true.

76. Some of the matters referenced in the PIP occurred before Mr. Peterson was Mr. McIver's supervisor and were not raised by Mr. McIver's previous supervisor, Terry Richardson.

77. After receiving the PIP, Mr. McIver called Honeywell's Ethics hotline and reported that he had been given a PIP and believed he was subjected to continued age discrimination and retaliation.

78. After receiving Mr. McIver's complaints of age discrimination, age-based harassment, and retaliation, Honeywell failed to transfer Mr. McIver to work under a new supervisor.

79. After receiving Mr. McIver's complaint of age discrimination and age-based harassment, and retaliation, Honeywell failed to take effective action to prevent Mr. Peterson from subjecting Mr. McIver to continued discrimination, discriminatory harassment, and retaliation.

80. On or about January 28, 2017, Mercedes Vallardes, Worldwide Director of Materials Lab, informed Mr. McIver that she could only talk to him about his PIP and not about his Age Discrimination and retaliation Ethics Complaint.

81. James Cobb, PDL Lab Engineer/Work Flow Specialist, who was younger than Mr. McIver and who had been promoted by Peterson, conspired with Mr. Peterson

8

to subject Mr. McIver to a hostile working environment for filing an Age Discrimination Complaint.

82. In approximately February 2015, every day for about one and half weeks, Mr. McIver discovered the safety alarm displays for the burner rigs were not functioning.

83. These are silent alarms that are visually displayed on the control computer. Mr. McIver informed Jim Cobb and Mr. Peterson multiple times for a week and half about this problem.

84. Upon information and belief, Mr. Cobb and Mr. Peterson had intentionally disabled the safety alarm displays to threaten Mr. McIver.

85. There are many potential dangers that are inherent to working in the Hot Corrosion Rig room based on the extremely hot temperatures and dangerous situations involving toxic gas.

86. If the safety alarm displays were not working and there was a hazardous gas leak, this could lead to very serious and critical safety problems for the workers in the room as well as for the entire building.

87. On February 19, 2015, Mr. McIver filed an EEOC Charge and asserted that he was subjected to unlawful discrimination and harassment by Honeywell because of his age and in retaliation for reporting and opposing discrimination and harassment in violation of the Age Discrimination in Employment Act of 1967.

88. After receiving Mr. McIver's EEOC Charge, Honeywell failed to take effective action to stop age discrimination, retaliation, and discriminatory harassment against Mr. McIver.

89. In March 2015, while Mr. Peterson was out of the office, Mr. McIver discovered that a bottle of customer test materials, calcium-magnesium aluminosilicate (CMAS) Bottle No. 5, had previously been hidden from him to alter a customer test and set him up for failure.

90. Mr. Peterson had falsely accused Mr. McIver in his PIP of mixing two bottles of CMAS.

91. Mr. Peterson had also repeatedly harassed Mr. McIver based on false accusations that Mr. McIver had mixed CMAS bottles 4 and 5.

92. Mr. Peterson had made false statements to customers that Mr. McIver had mixed CMAS bottles 4 and 5.

93. Despite Ms. Vallardes' refusal to discuss the Age Discrimination and retaliation Ethics Complaint, Mr. McIver reported to Ms. Vallardes the numerous false statements in the PIP, including the CMAS bottle that had been hidden from him to set him up for failure.

94. Mr. Peterson continued to subject Mr. McIver to discriminatory and retaliatory harassment including making demeaning and untrue statements about Mr. McIver's work performance and interfering with Mr. McIver's ability to do his job.

95. After being subjected to intolerable working conditions in which he could no longer work safely, productively or effectively, Mr. McIver was constructively discharged on or about March 23, 2015 after approximately 33 years of employment with Honeywell.

96. The EEOC issued a Letter of Determination with a cause finding in favor of Mr. McIver.

97. The EEOC found:

> there is reasonable cause to believe Respondent violated the ADEA when it subjected Charging Party to age based harassment and retaliated against him for opposing discrimination by placing him on a Performance Improvement Plan and constructively discharging Charging Party.

## FIRST CAUSE OF ACTION

**AGE DISCRIMINATION AND HARASSMENT IN VIOLATION OF ADEA**

98. Plaintiff incorporates all previous allegations as though set forth fully herein.

99. At all relevant times, Plaintiff was over the age of 40.

100. Defendant subjected Plaintiff to severe and pervasive age-based harassment including but not limited to offensive age-based comments, disparate and less favorable treatment than younger employees, demeaning and false statements about his work performance, risks to his health and safety, and interference with his ability to do his job safely or effectively.

101. Defendant discriminated against Mr. McIver based on his age by placing him on a Performance Improvement Plan with a number of false statements.

102. As a direct result of the severe and pervasive age-based harassment, Mr. McIver experienced extreme emotional distress and feared for his health and safety.

103. Because of the age harassment and age discrimination, in violation of the ADEA, Mr. McIver's working conditions became so intolerable that a reasonable person in Mr. McIver's position could not have continued working for Defendant.

104. Because of the discriminatory harassment, in violation of the ADEA, Defendant forced Mr. McIver to constructively discharge.

105. Defendant's age-based harassment and discrimination against Plaintiff was willful, knowing, intentional, and reckless.

106. Defendant unlawful employment practices were willful within the meaning of the ADEA, entitling Mr. McIver to liquidated damages.

107. As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer lost income, lost benefits, and additional monetary losses.

## SECOND CAUSE OF ACTION
## RETALIATION AND RETALIATORY HARASSMENT IN VIOLATION OF ADEA

108. Plaintiff incorporates all previous allegations as though set forth fully herein.

109. Defendant subjected Plaintiff to retaliation because he engaged in protected activity by repeatedly reporting age discrimination.

110. Because Plaintiff engaged in protected activity and reported age

11

discrimination, Defendant subjected Plaintiff to retaliatory adverse employment action and severe and pervasive retaliatory harassment, including but not limited to, placement on a Performance Improvement Plan, disparate and less favorable treatment, demeaning and false statements about his work performance, risks to his health and safety, and interference with his ability to do his job safely or effectively.

111. As a direct result of the severe and pervasive retaliatory harassment and adverse employment action, Mr. McIver experienced extreme emotional distress and feared for his health and safety.

112. Because of the severe and pervasive retaliatory harassment and adverse employment action, in violation of the ADEA, Mr. McIver's working conditions became so intolerable that a reasonable person in Mr. McIver's position could not have continued working for Defendant.

113. Because of the retaliatory harassment and adverse employment action, in violation of the ADEA, Defendant forced Mr. McIver to constructively discharge.

114. Defendant's retaliatory harassment and adverse employment action against Plaintiff was willful, knowing, intentional, and reckless.

115. Defendant unlawful employment practices were willful within the meaning of the ADEA, entitling Mr. McIver to liquidated damages.

116. As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer lost income, lost benefits, and additional monetary losses.

**JURY TRIAL DEMAND**

117. Plaintiff demands a jury trial on all claims and issues set forth herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, John McIver, prays for judgment against Defendant as follows:

    A.    For an award of economic damages, including back pay with pre-judgment interest, in an amount sufficient to make Plaintiff whole

|   | | |
|---|---|---|
| | | for past and future lost income and benefits and other economic losses suffered by Plaintiff resulting from Defendant's conduct; |
| | B. | For an award of front pay in lieu of reinstatement; |
| | C. | For an award of liquidated damages for willfulness within the meaning of the ADEA; |
| | D. | For an award of prejudgment and post-judgment interest |
| | E. | For an award of attorneys' fees and related expenses; |
| | F. | For an award of Plaintiff's costs of suit incurred herein; and, |
| | G. | For an award of such other relief as the Court may deem just and proper. |

DATED this 16th day of February 2018.

ROBAINA & KRESIN PLLC

By /s/ Meenoo Chahbazi
    Meenoo Chahbazi
    Edmundo P. Robaina
    Attorneys for Plaintiff John McIver